# Exhibit F




BUDD LARNER
A PROFESSIONAL CORPORATION
COUNSELLORS AT LAW

150 JOHN F. KENNEDY PARKWAY
SHORT HILLS, NJ 07078-2703
973.379.4800
FAX 973.379.7734
www.buddlarner.com

WRITER'S DIRECT DIAL: (973) 315-4407
WRITER'S E-MAIL: jschiavone@budd-larner.com

February 12, 2007

Edmond F. Rondepierre
8 Linda Lane
Darien, CT 06820

Richard L. White
58 Pine Boulevard
Cedar Knolls, N.J. 07927

Arthur C. Brotter
11601 Baird Avenue
Northridge, California 91326

**RE: In the Matter of the Arbitration Between Global Reinsurance Corp. - U.S. Branch f/k/a Gerling Global Reinsurance Corp. - U.S. Branch v. Argonaut Insurance Company (Quota Share)**

Dear Panel Members:

I am writing on behalf of GLOBAL Reinsurance Corporation ("Global") in support of a Motion to Clarify this Panel's Award, dated January 10, 2007. A copy of the Award is annexed hereto for convenient reference. We respectfully request the Panel to treat this letter as a Motion, to allow Argonaut a reasonable time to respond, and to allow Global the opportunity for a reply, consistent with past practices in this matter.

This Motion for Clarification is necessitated by a dispute that has arisen between Global and Argonaut with respect to the interpretation of the Award. It appears that both Global and Argonaut agree that the Panel denied Global's claim for recovery on billings made to Argonaut with respect to the AIG and Home commutations. This is reflected in the second paragraph of the Award where a majority of the Panel states: "Argonaut is not required to pay the amounts sought by Global in this arbitration." Also in the second paragraph of the majority's Award are references to the majority's view that the agreements do not allow for recovery of "commutation payments" or for the "unilateral acceleration of the retrocessionaires' obligations." The Award states specifically: "The <u>commutation payments</u> that Gerling seeks to cede to Argonaut are not claims, losses, nor settlements within the terms or the meaning of the retrocessional agreements." (Emphasis added). The dissent also evidences the view that the Award relates only to billings for commutation payments: "With this Award the majority affirms that the commutation payments which Global seeks to cede to Argonaut are not settlements within the terms or meaning of the Retrocessional Agreements."

It is Global's interpretation of the Award that it is entitled to bill Argonaut in the future as claims actually develop on the underlying reinsurance agreements between Global and AIG and between Global and Home. As counsel for Global, we contacted Argonaut to determine whether they agreed with Global's interpretation. It was only last Thursday that we received an answer from Argonaut, which advised that Argonaut totally disagrees with Global's interpretation of the clear terms of the Award. Argonaut's apparent position is that the Award somehow means that Global is forever and conclusively foreclosed from seeking any recovery from Argonaut under the retrocessional agreements for any loss of any kind relating to AIG or Home. According to Argonaut, this apparently means that, even as losses develop in the normal course at AIG and Home, those losses cannot be billed to Argonaut.

Argonaut's interpretation is inconsistent with the wording of the Award. As discussed above, the Award only denies Global's claims for payment for the "commutation payments." In addition, the third paragraph of the Award specifically preserves Global's right to bill and collect under the retrocessional agreements for non-commutation losses in the future. Thus, the third paragraph of the Award provides that the Order "does not alter Argonaut's obligations under the retrocessional agreements." That paragraph further provides: "Argonaut may be obligated to pay claims submitted in the form required by those agreements."

The Panel most definitely did not order, as Argonaut suggests, that Global would be entitled to no recovery for any losses related to AIG and Home in the future. If the Panel intended to rule that all future (non-commutation) claims related to AIG and Home were foreclosed, it would have stated so expressly. More importantly, if that had been the majority's ruling, the language in the third paragraph of the Award -- which we believe was apparently intended to preserve Global's ability to bill Argonaut as claims develop on AIG and Home -- would have been totally unnecessary. If such claims were foreclosed, why would the Award state that "Argonaut may be obligated to pay claims submitted in the form required by these agreements"?

Apart from Argonaut's strained interpretation of the express terms of the Award, Argonaut's position is also utterly inconsistent with the testimony of its claims vice president, Rhonda Ijams. As the Panel will recall, Global argued at the hearing that Argonaut was attempting to obtain a windfall or forfeiture with respect to the AIG and Home commutation payments. In an effort to deflect this argument, Argonaut argued to the Panel that there would be no windfall or forfeiture because Global could bill actual losses in the future relating to AIG and Home as they developed. Accordingly, Rhonda Ijams testified as follows:

> Q. Miss Ijams, you are hoping that the panel will let Argonaut off the hook, so to speak, and not pay the billings that are at issue in this arbitration, aren't you?

A. Yes.

Q. And you say, and some of Argonaut's other witnesses have said, that Global can continue to report claims to Argonaut as adverse development takes place, and that Argonaut will then consider paying those claims; right --

A. Yes.

Q. --paying those billings; is that correct?

A. Sorry.
Yes.

Q. Now, that means that AIG would have to continue reporting claims to Global; right?

A. Yes.

Q. And Home's liquidator would have to continue reporting claims to Global; right?

A. Yes.

Q. And your testimony on direct concerning Exhibit 112, A-112 -- I'll wait for you to get to it, Miss Ijams.

A. Thank you.

Q. You testified in connection with that exhibit that The Home had indicated that it would continue to report claims to Global; right?

A. That was my impression of it, yes.

Transcript (Tr.) at 1500/4 to 1501/11. (A copy of the transcript is annexed hereto).

Ms. Ijams testified at the hearing that, in order for Global to report claims to Argonaut for AIG and Home as losses occur, Global would be required to continue to handle the claims in the future. Tr. at 1502/19 to 1503/3. She also testified that Global would have to communicate with

the Home liquidator and with AIG to obtain information or documentation from time to time concerning claims for reporting to Argonaut. Tr. at 1503/4-11. Ms. Ijams further testified that this would require a "minimal amount of diligence in processing the information" from AIG and Home, but that "if we [Argonaut] had an inquiry, we would be willing to direct it to AIG or the Home." Tr. at 1504/8-20.

Ms. Ijams recognized that, if Global did not recover from Argonaut on its commutation payments, Global would have to continue to issue bordereaux to Argonaut as claims developed. Tr. at 1504/21-23. Ms. Ijams was also asked quite directly whether she had any reason to believe that AIG would be willing to continue to report to Global after the AIG/Global commutation, and she answered affirmatively. Tr. at 1505/10-16. She further recognized on cross-examination that Global's ability to bill Argonaut in the future on AIG or Home would not be "capped" or limited by the amount that had been allocated to such claims by Global in connection with the commutation billings:

> Q. Miss Ijams, suppose that The Home -- that the Home's liquidator, and AIG and Global, were prepared to do and did all these things that we've been talking about, all right. And suppose that in a few years Global's billings to Argonaut in respect of the State of California ended up being -- let's see, where are we here, State of California -- let's suppose that they ended up being $60,000, instead of $45,000, so that the adverse development on these known environmental claims, known environmental losses, was more severe than Navigant had projected. <u>Would Argonaut be obliged to pay the $15,000 in excess of the 45?</u>
>
> A. <u>Yes, they would.</u>
>
> Q. <u>And would Argonaut pay that?</u>
>
> A. <u>Yes.</u>

Tr. at 1505/20 to 1506/13 (emphasis added).

Miss Ijams' testimony made clear that Argonaut was prepared to pay AIG and Home claims as they actually developed, but not on an estimated or "accelerated" basis. Ms. Ijams surely did this in order to convince the Panel that there would be no unfairness, as argued by Global, in denying Global's claims for commutation payments.

Global's closing argument focused precisely on the concepts of forfeiture and windfall. Tr. at 1623/3 to 1625/10. Global argued that Ms. Ijams and Argonaut were being unrealistic in asking this Panel to believe that, if the Panel denied recovery on these AIG/Home commutation

claims, Global would be able to obtain the necessary information from AIG and Home to bill Argonaut as the claims actually develop. Id. And Argonaut's position at that time was that Global could obtain that information and, therefore, there would be no unfairness to Global. Now, Argonaut's tortured reading of the Award is designed to achieve precisely the unfair result that it pretended to eschew at the hearing.

Now that Argonaut has achieved its goal of denial of recovery for the commutation payments, it is unfairly attempting to argue that future billings on actual losses on AIG and Home are also foreclosed, something that is directly contrary to Ms. Ijam's testimony and the terms of the Award.

Argonaut should be ordered by this Panel to live up to the statements that were made by its senior claim executive, Rhonda Ijams, at the hearing. In view of Argonaut's self-serving and strained interpretation of the Panel's Award, we respectfully request the Panel to clarify the Award and to establish claims protocols going forward for the handling of claims going forward on AIG and Home. We are simply asking for protocols that are consistent with the testimony given under oath by Ms. Ijams at the hearing. These protocols are set forth in four paragraphs that are annexed hereto.

* * *

We respectfully submit that one of the distinctive advantages of arbitration is that an experienced Panel can assist the parties in pragmatic ways regarding their business relationship. Here, it is clear that, in the absence of some guidelines from the Panel, there will be further disputes on issues that were already covered by Ms. Ijams in her testimony, which was given when Argonaut had every incentive to make it appear that future claims handling on AIG and Home as claims developed would be fair and practicable. Our suggested protocol is simply designed to promote those goals. We are simply asking for Argonaut to be ordered to stand by their own statements under oath to this Panel.

Respectfully submitted,

JOSEPH J. SCHIAVONE

JJS:mis
enclosures
630279.W

**Jeffery Siedsma - Global - Argonaut (QS)**

**From:** <NANANDED@aol.com>
**To:** <hajost@halloran-sage.com>, <Jschiavone@budd-larner.com>, <blumenthal@halloran-sage.com>, <Jleonard@budd-larner.com>
**Date:** 1/10/2007 2:02 PM
**Subject:** Global - Argonaut (QS)
**CC:** <abrotter@socal.rr.com>, <deputy@iicil.org>

---

In the Matter of the Arbitration Between

Global Reinsurance Corporation
- U.S. Branch,

Petitioner,

- and -

Argonaut Insurance Company,

Respondent.

Arthur C. Brotter

Richard L. White

Edmond F. Rondepierre
Umpire

---

AWARD

Having considered the submissions and arguments of Counsel, the testimony of witnesses at the hearing and the record in this arbitration a majority of the Panel rules as follows:

The commutation payments that Gerling seeks to cede to Argonaut are not claims, losses nor settlements within the terms or the meaning of the retrocessional agreements. The agreements make no provision for claims submitted in bulk or blanket form, nor for payments on a non risk – specific basis or an estimated basis. The agreements provide no authority for the unilateral acceleration of the retrocessionaires obligations. Argonaut is not required to pay the amounts sought by Global in this arbitration.

This order does not alter Argonaut's obligations under the retrocessional agreements. Argonaut may be obligated to pay claims submitted in the form required by those agreements.

Arthur Brotter

Edmond F. Rondepierre
Umpire

10 January 2007

**DISSENT OF ARBITRATOR RICHARD L. WHITE**

Re: Quota Share Retrocession Agreement for Facultative Casualty Business #4158/QS31 ("Quota Share") and First Surplus Facultative Casualty Retrocession Contract #6103/QS73 ("Surplus") [collectively the "Retrocessional Agreements"]

With this Award the majority affirms that the commutation payments which Global seeks to cede to Argonaut are not settlements within the terms or the meaning of the Retrocessional Agreements; I disagree. In my view, the majority's ruling is incorrect because it does not comport with (1) the nature, i.e., the characteristics, of quota share reinsurance generally, (2) the language of the Retrocessional Agreements specifically, in particular the Quota Share agreement, and (3) reinsurance custom and practice.

Quota share reinsurance is proportional reinsurance in which the reinsurer assumes an agreed percentage of each risk insured. Because these parties are reinsurers, the agreed percentage would apply to each facultative risk reinsured. Absent some provision in the contract to the contrary, the loss experience of the reinsurer and retrocessionaire is intended to be proportionally identical.

So congruent is quota share reinsurance that such contracts need only have an accounts and reporting provision to effect payment between contracting parties. In contrast, these Retrocessional Agreements include a Loss Settlements provision which underscores the parties' intention that this reinsurance protection will be something more than the standard "follow the liability of the reinsured" coverage.

Indeed, the coverage augmentation of these loss settlement clauses provides: that the reinsurer (here, the retrocedent, Global), "...**alone** will settle all claims and such settlements shall **under all circumstances** be binding on the Retrocessionaires in accordance with the terms of this Agreement." (Quota Share Article VII, 1.) and "**All** payment of claims made by the Company [Global] will be binding upon the Retrocessionaires." (Surplus Article VIII, B.) [Emphasis added]

Now it is true that unlike the typical commercial contract, reinsurance contract provisions often rely for their understanding on the trade usage and practice of the reinsurance industry. Such custom and practice, however, may amplify contract provisions but it may not contradict those provisions. Consider the Retrocessional Agreements in this dispute. Argonaut presented evidence at the Hearing (albeit disputed by Global) that notice of the commutations was not provided, or if arguably provided, such notice was insufficient. This lack (or insufficiency) and the related retrocessionaire concurrence, it was argued, was fatal to Global's ability to cede the commutation payments.

Evidence was provided that at least twenty-two retrocessionaires reinsured Global on the affected contracts. The majority's ruling doesn't indicate whether a substantial concurrence, say, 25% would have been sufficient to permit billing or if a majority or indeed a supermajority concurrence would have done the job. A fair reading of our Award is that unanimity would be required for Global to successfully bill the commutation payments. This principle of collegiality, as it were, is nowhere in the Retrocessional Agreements. Moreover, there is nothing in the record that remotely suggested custom and practice embraced such unanimity. Indeed, independent of the record in this dispute, it is difficult to imagine a situation where trade usage for a ceded commutation transaction, would require the unanimity of retrocessionaire concurrence and the inevitable Babel-like communication of so many voices.

The commutation payments in this arbitration, paid in connection with an arms length transaction between Global and certain ceding companies, relieved Global and its retrocessionaires of all liability pursuant to the subject facultative certificates. Despite this extraordinary relief and the explicit loss settlement provisions of the Retrocessional Agreements, our Award sanctions Argonaut's refusal to pay its proportion of the commutation payments. Notwithstanding the high personal regard I have for my co-panelists, I respectfully dissent.

Richard L. White, Arbitrator

Dated: January 10, 2007

PROTOCOLS FOR PROCESSING CLAIMS INVOLVING AIG AND HOME

1. The procedure for billings on a going forward basis would require Global to continue to handle claims, but this would require a "minimal" level of diligence on Global's part. Audits of Global's cedent would not be required.

2. The concept of follow the settlements would apply.

3. In order for Global to be entitled to bill Argonaut, there would be no requirement that Global pay claims with "new" money; Global would approve claims for payment but not actually pay them. If the approval was appropriate given the "minimal diligence" required of Global, then Argonaut would pay. Global would not be required to obtain bills to it from cedents with which it has commuted.

4. No cap would apply to Global's billings to Argonaut (except as set forth in the applicable retrocessional contracts). Argonaut recognizes that it took a business risk and made a business decision that it did not want the benefit or the burden of the commutation. Accordingly, if Argonaut were billed more on a particular claim than it had been billed as part of the commutation, then the larger amount would be applicable. Similarly, if a claim developed against a contract to which no commutation allocation had been made, this would not be an impediment to recovery. Nor would the total amount paid by Global be a cap on the amounts recoverable from Argonaut.