# EXHIBIT 3

**SUPREME COURT OF THE STATE OF NEW YORK**

**COUNTY OF NEW YORK**

---

GLOBAL REINSURANCE CORPORATION – U.S. BRANCH
f/k/a GERLING GLOBAL REINSURANCE CORPORATION -
U.S. BRANCH,

                                        Plaintiff,

                    -against-

EQUITAS LTD.; EQUITAS REINSURANCE LTD.; and
EQUITAS POLICYHOLDERS TRUSTEE LTD.,

                                        Defendants.

---

Index No. **600815/07**

**COMPLAINT**

NEW YORK
COUNTY CLERKS OFFICE

MAR 14 2007

NOT COMPARED
WITH COPY FILED

Plaintiff alleges:

## NATURE OF THE ACTION

1.      Plaintiff, Global Reinsurance Corporation – U.S. Branch ("Global"), brings this action to recover damages for the anticompetitive and tortious conduct committed by defendants, Equitas Ltd., Equitas Reinsurance Ltd., and Equitas Policyholders Trustee Ltd. (collectively "Equitas").

2.      Equitas's anticompetitive conduct consists of the creation and implementation of, and defendants' current and continuing conduct pursuant to, the so-called Reconstruction and Renewal Plan (the "R&R Plan") whereby formerly independent syndicates of underwriters at Lloyd's abdicated any independent responsibility for claims decisions within the scope the R&R Plan and combined and contracted with one another and with Equitas to vest all such responsibility in defendants. As a direct and intended consequence of defendants' combination, the free exercise of decisionmaking activity with respect to retrocessional claims arising within this State has been completely eliminated. By the R&R Plan and their conduct pursuant thereto, defendants have restrained and are restraining competition in, and the free exercise of, claims activity

with respect to retrocessional claims arising within this State. The conduct set forth herein, and detailed further below, violates New York's Donnelly Act, N.Y. Gen. Bus. L. § 340.

3.    Equitas's tortious conduct consists of knowing interference with the performance by Global's counterparties under certain retrocessional reinsurance treaties ("Treaties"), which are valid, subsisting contracts. Global is the retrocedent under the Treaties, and various underwriters at Lloyd's, London ("Underwriters") are the retrocessionaires. Pursuant to the R&R Plan, Equitas controls Underwriters' performance under the Treaties and, through a variety of means set forth in detail below, has effectively caused Underwriters to cease good faith performance of their obligations, to Global's damage.

4.    With respect to the tortious interference claim, Global seeks to recover all damages resulting from Equitas's tortious interference with Global's contractual relationship with Underwriters.

5.    With respect to the Donnelly Act claim, Global seeks to recover treble the damages caused by defendants anticompetitive conduct, plus costs and attorneys' fees.

6.    Global also seeks injunctive relief prohibiting Equitas from engaging in the unfair claims handling practices and deceptive business practices described herein. Injunctive relief is appropriate in this situation to avoid a multiplicity of actions and because some portion of the injury Equitas is causing Global may not be quantifiable in damages.

## THE PARTIES

7.    Global is a branch of a foreign reinsurance company organized under the laws of Germany, with its principal place of business in Cologne, Germany. It is authorized to write certain insurance and reinsurance in New York, and it maintains a place of business at 1345 Avenue of the Americas, New York, New York 10105.

8.    Equitas Ltd. ("Equitas Ltd.") is a corporation organized under the laws of the United Kingdom and maintains its principal place of business at 33 St. Mary Axe, London EC3A 8LL, United Kingdom.

9.    Equitas Reinsurance Ltd. ("Equitas Reinsurance") is a corporation organized under the laws of the United Kingdom and maintains its principal place of business at 33 St. Mary Axe, London EC3A 8LL, United Kingdom. Equitas Reinsurance is a wholly-owned subsidiary of Equitas Holdings Ltd..

10.    Equitas Policyholders Trustee Ltd. ("EPTL") maintains its registered office at 33 St. Mary Axe, London EC3A 8LL, United Kingdom.

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over Equitas pursuant to CPLR § 302.

12.    Equitas has, *inter alia,* arranged for payment to Global in New York, attended meetings with Global and others in New York, initiated phone calls into New York, forwarded mail and electronic mail communications to Global and others in New York, controlled settlement of claims in New York, and directed litigation in New York.

13.    Global has been injured in New York by the actions and conduct of Equitas, including the attempted unilateral imposition of extra-contractual conditions on Global's rights to payment under the Treaties and bad faith claims-handling practices, which has resulted in the unreasonable cessation, denial or delay of payments due from Underwriters.

14.    Venue is proper in New York County pursuant to CPLR § 503(c), as Global is a branch of a foreign corporation authorized to transact business in the State of New York, with a principal place of business in the County of New York at 1345 Avenue of the Americas, New York, New York 10105.

## BACKGROUND

### Reinsurance

15.    "Reinsurance" comprises arrangements whereby one insurance company (the "re-insured" or "ceding company" or "cedent") passes on to another insurance company (the "rein-surer") all or a portion of a risk or risks it has assumed. The reinsured "cedes" a portion of its premium to the reinsurer, which undertakes to reimburse the reinsured for an agreed-upon por-tion of losses and/or expenses.

16.    Reinsurers, such as Global, often further reinsure their obligations, as "retroce-dents," to other reinsurers, known as "retrocessionaires," under retrocessional agreements, fur-ther spreading the risk assumed by the cedents and reinsurers.

17.    The relationship between the ceding company and its reinsurer is contractual. The relationship between the retrocedent and its retrocessionaire is also contractual.

18.    As a general matter, the cedent enters into insurance contracts with policyholders that provide coverage for losses incurred by the policyholder.

19.    Once a cedent pays a covered claim to or on behalf of the policyholder, the cedent presents the claim to the reinsurer under the terms of the reinsurance contract, subject to the doc-trine of "follow the settlements."

20.    Once the reinsurer has paid its agreed share of the claim to the cedent, the rein-surer, as a retrocedent, then presents the claim to the retrocessionaire under the terms of the ret-rocessional agreement, subject to the doctrine of "follow the settlements."

21.    Under a retrocessional treaty, several retrocessionaires may agree to provide cov-erage, with each retrocessionaire providing a percentage of total coverage.

### Lloyd's Syndicates and the London Marketplace

22.    "Lloyd's" is a marketplace in London, England at which insurance, reinsurance, and retrocessional coverage are bought and sold.

23. Individual underwriting members of Lloyd's, or "Names," are grouped together for each given operating year to form a "syndicate year of account," or "Syndicate."

24. In each operating year, there are hundreds of Syndicates, each independent from the others, competing for the placement of new insurance, reinsurance, and retrocessional business.

25. Each Syndicate is usually referred to by the name of the active underwriter in the group of Names, who makes underwriting decisions for the group.

26. The "Underwriters" in this Complaint are the members of the Syndicates that were signatories to the Treaties with Global.

27. Underwriters are obligated to provide specified percentages of the retrocessional coverage provided under the Treaties at issue here.

***Equitas***

28. In the 1980s and 1990s, many Names faced financial ruin after large losses outpaced the collection of premiums.

29. As a result, the Lloyd's marketplace was restructured in 1996 through the R&R Plan, which undertook to fix and cap the liabilities of the Names on pre-1993 business by reinsuring those liabilities into a new entity — Equitas. Equitas was established to reinsure and perform claims-handling responsibilities for certain pre-1993 liabilities of the Names, including liabilities under retrocessional agreements with retrocedents such as Global.

30. On September 3, 1996, Equitas Reinsurance, Equitas Ltd. and EPTL (collectively, "Equitas") entered into a "Reinsurance and Run-Off Contract" ("RROC") with certain Names.

31. The RROC defines the role, duties and powers of Equitas.

32. The RROC purports to grant Equitas the "exclusive and irrevocable responsibility" for certain pre-1993 non-life liabilities of the Names. "Non-Life" is Lloyd's-speak for prop-

-5-

erty, casualty, and related lines of insurance business and includes, as a category, all of the business that was subject to the Treaties.

33. The RROC purports to grant Equitas authority to manage all claims on behalf of Underwriters for business within its scope and, accordingly, authority to make or withhold payment to policyholders, cedents, and retrocedents that contracted for insurance or reinsurance coverage with the Names/Syndicates.

34. Specifically, the RROC provides that, with respect to pre-1993 non-life claims, Equitas Reinsurance shall have the "power to adjust, handle, agree, settle, pay, compromise or repudiate any Claim, return premium, reinsurance premium or any other insurance or reinsurance liability on behalf of the Syndicate or Closed Year Syndicate[.]" RROC, § 9.2(a).

35. Prior to the RROC, the Syndicates had the right to make, and often did in fact make, their own independent decisions on whether a given claim was valid, including whether and when to pay the claim, and in what amount. After the RROC, all of those decisions are made solely by Equitas.

36. Prior to the R&R Plan, and the RROC implementing it, claims service was an element of competition between the Syndicates.

    (a)    Specifically, each Syndicate, and its active underwriter, knew that the positions it could take on claims matters were constrained by the need to preserve a reputation for fairness and good business character, so that insureds, ceding companies, and brokers would continue to do business with them. The use of claims service as an element of underwriting competition had been a central tenet of the Lloyd's philosophy since the days of Cuthbert Heath.

    (b)    In addition, the fragmented nature of the Lloyd's market meant that when multiple Syndicates participated on the same risk, their claims decisions on that risk needed in general to surmount some threshold of rationality and good faith. A Syndicate that took unreasonable positions would not be able to persuade its co-insurers (or co-reinsurers) to go along and thereby faced the prospect of expensive claims litigation with no one to share the cost.

37. The R&R Plan completely eliminated both of these forms of competition.

    (a)    By placing *all* of the Syndicates simultaneously into "runoff" with respect to pre-1993 business, the R&R Plan protected each Syndicate (and its active underwriter) from claims services competition with respect to pre-1993 busi-

ness. Even when conducted in good faith (which Equitas emphatically is not), runoff operations tend to take more hardnosed claims positions than do operations that must continue to compete for new business. Individual Syndicates and their active underwriters could not afford to place their own pre-1993 business into runoff and hope to continue to write new business (which Lloyd's as a market, and the Syndicates individually, wished to do and thereafter did in fact do); the plan could only be effective if it was market-wide and thus insulated each individual Syndicate and underwriter from the competitive consequences of runoff-style behavior.

(b)    Likewise, by concentrating claims decisionmaking in a single entity, the R&R Plan eliminated the need for a claims manager who wished to take an aggressive (or worse) claims position to persuade colleagues as to the merits of his/her determination. Unlike the individual Syndicates as they existed before the combination effected by the R&R Plan, Equitas does as it pleases, without the check of (and financial constraints imposed by) other voices and second opinions.

38.    The RROC pooled the reserves held by or on behalf of the individual Names to meet their individual liabilities and marshaled those reserves into a separate fund (the "Equitas Fund").

39.    Equitas manages and controls the assets in the Equitas Fund.

40.    Equitas is solely responsible for the management of the Equitas Fund's assets.

41.    The Names cannot reach the Equitas Fund's assets.

42.    The Equitas Fund's assets are segregated from the reserves maintained by Lloyd's on behalf of the Names.

43.    Equitas receives no annual contributions from the Names.

44.    Equitas operates wholly outside the regulatory system governing Lloyd's in the United Kingdom.

45.    Equitas submits financial statements separate from Lloyd's.

46.    Equitas is subject to different regulations than Lloyd's under United Kingdom law.

## WRONGFUL CONDUCT OF EQUITAS

47.     Equitas has engaged in unlawful and unfair business practices in its business deal-ings with Global and, as a result, has tortiously interfered with Global's contractual relations with Underwriters. These unfair business practices, which are described in detail herein, have caused, and continue to cause, substantial damages and economic hardship to Global as retroce-dent under the Treaties.

48.     Many, if not all, of these practices were made possible only by the combination effected by the R&R Plan. That is, Equitas could not have behaved — or could not have effec-tively behaved — as set forth herein absent the vastly increased economic power and the sup-pression both of competition and of the free exercise of independent claims judgment created by the R&R Plan. The harm to Global caused by Equitas's misconduct has likewise been increased by the combination effected by the R&R Plan.

### Equitas's Refusal to Pay Home, AIG, and Hartford Pre-Commutation Balances Without A Release

49.     A "commutation" of one or more reinsurance agreements is an agreement to re-solve all future liabilities under the subject reinsurance agreement(s) on terms negotiated be-tween the parties.

50.     In April, 2003, Global and the Home Insurance Companies ("Home") entered into a Reinsurance Commutation Agreement, Settlement and Release whereby Global, as reinsurer, and Home, as cedent, agreed that Global would pay, and Global did pay, to Home a certain sum to fully and completely settle all of Global's future obligations to Home under the various rein-surance agreements previously entered into between Home and Global (the "Home Commuta-tion").

51.     On June 30, 2003, Global and American International Group, Inc. ("AIG") en-tered into a Commutation and Release Agreement whereby Global, as reinsurer, and AIG, as ce-dent, agreed that Global would pay, and Global did pay, to AIG a certain sum to fully and com-

-8-

pletely settle all of Global's future obligations to AIG under the various reinsurance agreements previously entered into between AIG and Global (the "AIG Commutation").

52.     On October 22, 2004, Global and The Hartford Companies, including First State Insurance Company (hereinafter jointly referred to as "Hartford"), entered into a Commutation and Release Agreement whereby Global, as reinsurer, and Hartford, as cedent, agreed that Global would pay, and Global did pay, to Hartford a certain sum to fully and completely settle all of Global's future obligations to Hartford under the various reinsurance agreements previously entered into between Hartford and Global (the "Hartford Commutation").

53.     Global's participation in the Home, AIG, and Hartford treaties that were commuted as described above was retroceded, in part, to Underwriters pursuant to the following Treaties:

- Per Risk Facultative Casualty Treaty No. 4112;
- Per Risk Facultative Casualty Treaty No. 4700;
- First Excess of Loss Casualty Facultative Reinsurance Treaty No. 4600;
- Second Excess of Loss Casualty Facultative Reinsurance Treaties Nos. 4199 and 4650;
- Third Excess of Loss Casualty Facultative Reinsurance Treaty No. 4850;
- Fourth Excess of Loss Casualty Facultative Reinsurance Treaty No. 4900; and
- First and Second Layer "Clash Cover" Treaties.

54.     The Treaties provide that all claims involving the retrocessions, when settled by Global, shall be binding on Underwriters.

55.     The Home Commutation did not release claims on outstanding reinsurance billings presented by Home to Global before the Home Commutation was executed.

56.     The AIG Commutation did not release claims on outstanding reinsurance billings presented by AIG to Global before the AIG Commutation was executed.

57.     The Hartford Commutation did not release claims on outstanding reinsurance billings presented by Hartford to Global before the Hartford Commutation was executed.

58.    Global has paid the pre-commutation reinsurance billings presented by Home, AIG and Hartford (the "Pre-Commutation Claims").

59.    Global has billed Underwriters under the Treaties for their respective shares of the Pre-Commutation Claims.

60.    Underwriters have not paid Global's billings on the Pre-Commutation Claims.

61.    Neither Underwriters nor Equitas have raised any good faith defenses to payment of the Pre-Commutation Claims.

62.    Equitas has caused Underwriters to refuse to render payment of the Pre-Commutation Claims unless Global agrees to provide Equitas and Underwriters with releases of all future liabilities in connection with each individual claim.

63.    Pursuant to industry custom and practice, reinsurers and retrocessionaires do not typically receive "releases" upon rendering payment of claims.

64.    Furthermore, the Treaties do not support Equitas's demand for a release in connection with any reinsurance claims submitted for payment by Global.

65.    By demanding such releases, Equitas is seeking to impose an extra-contractual condition to Global's right to payment under the Treaties.

66.    Equitas is in a position to demand such extra-contractual conditions to payment only because of the economic power it illegally obtained through the combination effected by the R&R Plan.

67.    Payment to Global on the Pre-Commutation Claims has been denied due to Equitas's tortious interference with Global's right to prompt payment from Underwriters under the Treaties.

68.    As of the date of this Complaint, Underwriters owe Global approximately $3.3 million for the Pre-Commutation Claims. Global has been damaged in that amount, plus interest, by Equitas's conduct as alleged herein.

***Equitas's Unilateral Imposition of Reinsurance***
***Documentation Requirements***

69.    On or about July 17, 2001, PricewaterhouseCoopers issued a "qualified" opinion on the financial condition of Equitas due, *inter alia*, to the "significant uncertainties" surrounding Equitas's ability to meet financial obligations, including outstanding claims.

70.    Also in 2001, Equitas announced to the press that asbestos claims in the six month period preceding September, 2001, had "exceeded expectations."

71.    The Chairman of Equitas, in the Equitas Holdings Ltd. Directors' Report for the Year Ended March 31, 2002 ("Equitas Directors' Report"), conceded that "[a]sbestos claims continue to be the greatest single threat to the stability of Equitas" and that "Equitas's future remains highly uncertain[.]"

72.    Also in the Equitas Directors' Report, the Claims Director of Equitas warned that "asbestos remains the most serious issue facing Equitas."

73.    In late 2001, faced with dwindling reserves and a declining solvency margin, Equitas implemented extra-contractual, impractical, and stringent documentation requirements for cedents, detailed below, in order to minimize payments on, *inter alia*, the reinsurance claims it was specifically created to handle.

74.    Global received a letter dated February 22, 2002 from John Wulfers addressed to Global, purportedly on behalf of "certain Underwriters at Lloyd's, London" who are parties to the Treaties, attaching what Mr. Wulfers described as the "final version" of Reinsurance Documentation Requirements ("RDRs") that were purportedly adopted by the Underwriters on February 21, 2002, and which were attached to the letter.

-11-

75.    The RDRs were, in fact, drafted by or on behalf of Equitas.

76.    The RDRs marked a significant change from claims-handling procedures under the Treaties between Global and Underwriters.

77.    The February 22, 2002 correspondence was forwarded to Global on behalf of and/or at the direction, authorization and under supervision of Equitas.

78.    The February 22, 2002 correspondence stated that payment of all asbestos-related claims settled between Global and its assured after March 31, 2002 would be conditioned upon compliance with these unilateral, extra-contractual, and burdensome documentation requirements.

79.    The RDRs mandate extensive documentation before reinsurance claims presented by Global will be paid, including:

- Detailed medical documentation requirements, including, on a claimant by claimant basis, a specific medical diagnosis that an asbestos claimant suffers from a disease caused in "substantial part" by exposure to asbestos and varying detailed proof requirements for mesothelioma, lung cancer, other cancers, asbestosis and pleural disease and pleural plaques.
- Sworn or verified statements for each claimant that an asbestos-containing product was used, or was present at the claimant's worksite, during the relevant period.
- Comprehensive work history of each claimant, including all employers and, for each employer, location and dates of employment, occupation and job duties.

80.    This information is required for each claimant, regardless of the number of claimants involved; i.e., information for each claimant in a large multi-claimant action involving potentially thousands of claimants must be provided.

81.    The RDRs effectively mandate that Global implement practices and procedures to effectuate compliance with the RDRs.

82.    In addition, the RDRs note that the documentation requirements may be changed at any time to include additional documentation of claims or different claims-handling procedures.

-12-

83.    None of these requirements is contained in the Treaties between Global and Underwriters.

84.    The information demanded by Equitas by way of RDRs is largely unavailable to retrocedents such as Global.

85.    Compliance with the RDRs would require the expenditure of large sums of money and dedication of vast resources by Global.

86.    The provisions of the RDRs conflict with applicable legal precedent, industry custom, Global's reinsurance agreements with its cedents, and Global's contractual relationships with Underwriters.

87.    The RDRs are inconsistent with both express and implied terms of the Treaties.

(a)    Under the terms of typical reinsurance agreements and the terms of the Treaties at issue, the cedent is the sole judge of what constitutes a covered claim and/or reinsurers must "follow the fortunes" of the cedent with respect to the settlement of claims.  The RDRs are an impermissible attempt by Equitas to substitute the judgment of Equitas for the judgment of Global, as the retrocedent.

(b)    An implied provision of every reinsurance agreement, and an express provision of the Treaties, is that the reinsurer must "follow the fortunes" or "follow the settlements" of the cedent.

(c)    Under the "follow the settlements" doctrine, a reinsurer cannot challenge its cedent's reasonable, good faith decision to settle or pay claims made pursuant to the underlying reinsured agreements.

(d)    The RDRs displace the "follow the settlements" standard by imposing Equitas's own extra-contractual, unilateral standard for what constitutes "reasonable and businesslike" claims handling.

(e)    Under applicable case law, a policyholder is not required to prove asbestos liability or damages to an absolute certainty before an insurer's obligation to pay is triggered.

(f)    The RDRs require extensive documentation requirements for asbestos-related claims in an effort to establish underlying liability with certainty.

(g)    The RDRs frustrate an important and necessary goal of the court system in the United States — to encourage prompt, fair settlements.

(h)    Retrocedents, including Global, are penalized for honoring billings presented by underlying cedents where the onerous RDRs cannot be met.

(i)    The RDRs ignore and conflict with the asbestos liability scheme in the United States and the realities of asbestos litigation confronting policyholders, cedents and retrocedents.

(j)     The RDRs also frustrate the efforts of retrocedents, including Global, to comply with their contractual obligations to underlying insurers.

88.    Since 2002, and continuing to the present, Equitas has asserted that the RDRs are not mandatory and that claims have been promptly paid since the implementation of the RDRs. These assertions are false. Global has not received payment for certain post-November 1, 2001 asbestos-related claims under the Treaties because Equitas has — in effect and while denying it is doing so —continued to require compliance with RDRs as a condition to payment of asbestos-related claims under the Treaties.

89.    Global's post-2001 claims have, in fact, been rejected for failure to comply with the RDRs.

90.    Prior to Equitas's attempt to unilaterally impose the extra-contractual RDRs, Equitas and/or Underwriters did not require any specific documentation not within Global's possession with respect to asbestos-related claims submitted by Global under the Treaties.

91.    Prior to Equitas's attempt to unilaterally impose the RDRs, asbestos-related claims submitted by Global under the Treaties were paid on behalf of Underwriters based upon the documentation available to Global.

92.    Prior to Equitas's attempt to unilaterally impose the RDRs, asbestos-related claims submitted by Global under the Treaties were paid on behalf of Underwriters without requiring compliance with the RDRs.

93.    Prior to Equitas's imposition of the RDRs, asbestos-related claims submitted by Global were paid in accordance with the reinsurance agreements and industry custom and practice and without the documentation now demanded.

94.    Since 2001, and continuing to the present, Underwriters have refused to indemnify Global and/or delayed payment for asbestos-related claims under the same Treaties under which Global had previously submitted billings and received indemnification for asbestos-related claims.

-14-

95.    Each time that Underwriters have delayed or denied payment to Global by reason of the RDRs, Equitas has caused Underwriters to breach the Treaties.

96.    Equitas's ability to implement the RDRs stems directly from the combination effected by the R&R Plan. The RDRs are effective only because they are imposed by the single, combined entity that — illegally and in violation of the Donnelly Act — replaced the previously independent economic actors (the Syndicates).

97.    Each time that Underwriters have delayed or denied payment to Global by reason of the RDRs, Equitas has injured Global by reason of the economic power it illegally obtained through the combination effected by the R&R Plan.

**Equitas's Suppression of Payments Due Under the
Treaties Pending the Bullen Deal**

98.    Certain Underwriters, led by a Syndicate known as the Bullen Syndicate, entered into a Special Purpose Treaty reinsurance agreement known as the "Bullen Treaty" with the Brussels, Belgium branch of Constitution Reinsurance Corporation ("CRC"). CRC (now known as Gerling Global Reinsurance Corporation of America) is an affiliate of Plaintiff here, having been purchased by Gerling-Konzern Globale Ruckversicherungs, AG and Gerling Global U.S. Investments, Inc. in 1998.

99.    The Bullen Treaty was purportedly in force for the 1989 underwriting year. In or about 2002, Equitas, on behalf of Underwriters, sought to negotiate a commutation of the Bullen Treaty with CRC.

100.    At the time Equitas began negotiations with CRC to commute the Bullen Treaty, there was approximately $4.8 million in outstanding balances owed by Underwriters to Global under the Treaties.

101.    Further, Global was advised by Equitas that certain balances due under the Treaties would be paid.

-15-

102. For instance, in January 2003, Equitas advised Global that it would receive a settlement of approximately $395,000 under the Treaties in connection with certain Uniroyal claims during the week of January 20, 2003.

103. However, Equitas thereafter advised Global that it was suppressing the promised payment of approximately $395,000.

104. Global also was advised in January 2003 that Equitas would be suppressing payment of $14,702 in connection with certain Ingersoll Rand claims submitted under the Treaties, as well as payment of $136,170 in connection with certain Foster Wheeler claims submitted under the Treaties.

105. As of January 23, 2003, Equitas was suppressing the payment of $500,181 in balances admittedly owed under the Treaties.

106. Thereafter, in February 2003, Global was advised that Equitas would also be suppressing payment of $105,545 in connection with certain Flintkote claims submitted under the Treaties.

107. By April 2003, Equitas was suppressing the payment of approximately $4.6 million in balances admittedly owed under the Treaties.

108. Equitas suppressed payment of the balances due under the Treaties in order to pressure CRC into affording Underwriters more favorable terms in connection with the proposed commutation of the Bullen Treaty (the "Bullen Commutation").

109. In May 2003, a settlement-in-principle was reached on a commutation of the Bullen Treaty for $1.6 million.

110. As part of the settlement, Equitas agreed to pay $4.8 million in balances admittedly then due from Underwriters to Global under the Treaties. Global did not receive payment of the approximately $4.8 million in balances admittedly due under the Treaties until July 9, 2003.

-16-

111.    The Treaties between Global and Underwriters do not provide for suppression of payment of balances due under the Treaties pending the commutation of unrelated reinsurance agreements.

112.    Equitas intentionally interfered with Global's contractual relationship with Underwriters by suppressing payment of balances due under the Treaties pending the finalization of the Bullen Commutation.

113.    Equitas's conduct in connection with the Bullen situation was improper as the Treaties at issue here are completely unrelated to the Bullen Treaty, and the terms and conditions of the Treaties do not support any effort by Underwriters or Equitas to withhold payment of uncontested balances pending the resolution of unrelated disputes.

114.    The Bullen Syndicate did not do any business as lead underwriter with Global and was not a party to any of the Treaties under which Equitas caused Underwriters to suppress payment while the Bullen commutation was being discussed.

115.    The only reason that Equitas was able even to contemplate its illicit suppression of unrelated balances was by reason of the combination effected by the R&R Plan, which put Equitas on both sides of transactions that would otherwise have been between unrelated entities.

### Equitas's Pattern and Practice of
### Financially "Starving" Global

116.    Equitas has also engaged in the pattern and practice of "starving" Global, *i.e.*, withholding payment on outstanding balances due under the Treaties, in order to leverage discounts from Global in connection with the payment of those balances.

117.    Global has placed all of its property and casualty operations into voluntary runoff and, as part of its exit strategy, has commuted reinsurance agreements with some of its cedents.

118.    Global continues to pay on claims that are submitted to it by cedents under reinsurance agreements that have not been commuted.

-17-

119.    Due to its runoff status, Global is particularly interested in collecting year-end re-insurance recoverables, because any overdue balances result in asset reduction penalties on Global's year-end balance sheets, and specifically on Schedule F of the Annual Statement.

120.    Equitas's practice of financially starving Global consists of Equitas's refusal to render payment on claims due under the Treaties until the end of Global's fiscal year.

121.    Under this practice, Equitas improperly withholds payment on claims in order to leverage discounts from Global.

122.    Because Equitas is aware that any overdue balances due to Global at year-end will result in penalties and, more specifically, an asset reduction on Schedule F of Global's Annual Statement, Equitas engages in this practice in order to extract discounts that Underwriters would otherwise not be entitled to in the ordinary course of business under the terms and conditions of the Treaties at issue here.

123.    Another method by which Equitas intentionally delays payment on claims owed to Global is by asserting frivolous defenses to payment such as by asserting unfounded late no-tice defenses and refusing to indemnify Global for its actual expenses in litigating and settling claims with its cedents in contradiction of the express terms of the Treaties and decades of cus-tom and dealing between the parties.

124.    Equitas has also engaged in the pattern and practice of improperly "bundling" claims and issues presented to it for payment and consideration by Global. Rather than analyz-ing the merits of each individual claim presentation as it presented, as required by the Treaties and industry custom and practice, Equitas uses bundling as a tactic to delay payment to Global and to leverage discounts on outstanding balances.

125.    For example, Global's broker presents its claims to Equitas by physically deliver-ing files relating to multiple, unrelated claims at one time. Equitas has refused to accept and ad-just the individual claims so submitted on an individual basis, and instead has suspended its re-

view and/or payment of *any* of the claims if it felt that additional documentation was needed as to any one.

126.    In refusing to treat the claims on an individual basis, Equitas has harmed Global by unjustifiably requiring its brokers to re-present claims solely because of issues relating to separate, unrelated claims and by the resulting delay in the payment of claims.

127.    This pattern and practice is contrary to Underwriters' contractual obligation under the Treaties, as well as custom and practice in the reinsurance industry, which dictate that a retrocessionaire is obligated to treat each presented claim separately and in good faith, and to pay or deny each claim on its individual merits.

128.    Equitas, as a matter of course and business practice, delays claim payments as long as it can, both to exert pressure, as alleged above, and to gain the use of funds for its own benefit.

129.    Equitas's dollar-weighted average time to payment of claims paid to Global over the last seven years is, conservatively, well over a year. That is just plain stealing. Equitas's intentional delays have caused substantial injury to Global. Interest at the New York statutory rate, compounded annually, on the day-to-day outstanding balance of claims that were open at some point after January 1, 2000 and paid by the end of 2006 exceeds $5 million.

130.    In addition, approximately $15.8 million is currently outstanding in past due balances owed by Equitas to Global under the Treaties (including the Pre-Commutation Balances discussed above).

131.    The Treaties require that Underwriters must "pay all amounts for which [they] may be liable immediately upon receipt of reasonable evidence of the amount due being furnished by [Global]." Thus, Underwriters are contractually obligated to immediately consider the evidence presented by Global and render payment on individual claims as they are presented.

132.    Equitas's practice of starving Global thus causes Underwriters to violate their ob-ligations under the Treaties to promptly process and pay Global's billings in good faith.

133.    Equitas's ability to engage in these practices stems directly from the combination effected by the R&R Plan, by which the previously independent Syndicates have been — ille-gally and in violation of the Donnelly Act — replaced by a single, combined entity that has no economic or business incentive to cause the Underwriters to honor their obligations under the Treaties.

### FIRST CAUSE OF ACTION
### (Tortious Interference with Existing Contracts)

134.    Global repeats and realleges paragraphs 1 through 133 of this Complaint.

135.    Each of the Treaties is a valid, subsisting contract between Global and certain Underwriters, pursuant to which those Underwriters are obligated to indemnify Global for pay-ments made to its reinsureds.

136.    Global has complied with all of the terms and conditions of the Treaties.

137.    Equitas has knowledge of Underwriters' contractual obligations to Global.

138.    Equitas intended to interfere with the contracts between Underwriters and Global and to procure the breach of Underwriters' obligations under the Treaties.

139.    Equitas has intentionally interfered, and continues to intentionally interfere, with the contracts between Underwriters and Global in the manner and by the methods, *inter alia*, set forth above.

140.    Equitas's interference with the contractual relationship between Global and Un-derwriters has resulted in the breach of Underwriters' obligations under the Treaties, thereby causing Global substantial economic damages.

141.    As a direct and proximate result of Equitas's unreasonable refusal to approve payment of the amounts owed by Underwriters under the Treaties, Global has been damaged in the sum of approximately $15.8 million in currently outstanding balances, together with interest thereon from the dates on which the payments were due, plus more than $5 million in interest on payments that have been paid late, as set forth above.

142.    As a further direct and proximate result of Equitas's unreasonable refusal to approve payment of the amounts owed by Underwriters under the Treaties, Global's value has been adversely impacted, subjecting it to regulatory control, significantly decreased valuation, and consequential damages.

143.    Global disclaims any obligation to plead independent illegality of Equitas's conduct but, as set forth above, that conduct does not merely constitute interference with contracts but is indeed independently illegal under the Donnelly Act, as set forth above and in the Second Cause of Action below.

### SECOND CAUSE OF ACTION
### (Violation of the Donnelly Act)

144.    Global repeats and realleges paragraphs 1 through 143 of this Complaint.

145.    The R&R Plan, and the RROC pursuant thereto, are combinations and contracts that restrain competition and the free exercise of business activity in the handling of retrocessional claims arising within this State.

146.    Each action of Equitas in denying or delaying payment on bases or in ways that, as alleged above, were facilitated or made effective by the power Equitas gained through the R&R Plan has caused separate injury to Global and constitutes a separate violation of the Donnelly Act, N.Y. Gen. Bus. L. § 340.

147.    By reason of Equitas's anticompetitive conduct, as alleged herein, and the harm caused to Global thereby, Global is entitled to recover threefold the damages it has sustained thereby, amounting to at least $62.4 million, plus interest, costs, and attorneys' fees.

### THIRD CAUSE OF ACTION
#### (Injunctive Relief)

148.    Global repeats and realleges paragraphs 1 through 147 of this Complaint.

149.    Global seeks injunctive relief enjoining Equitas from engaging in the unfair claims settlement and business practices described above. Injunctive relief is appropriate in this situation because Global's remedy at law is incomplete in the face of the ongoing and continuing unfair business practices by Equitas that continue to place undue burden upon Global as a ceding reinsurer.

150.    Injunctive relief is also appropriate to avoid a multiplicity of actions. Damages alone cannot compel Equitas to cease engaging in the unfair business practices described in this Complaint, and Global cannot afford to sue repeatedly to continue to obtain by reason of Equitas's misconduct.

151.    Furthermore, damages alone cannot protect Global and other similarly situated cedents, and cannot avoid injury to Global's business reputation and goodwill and community standing. Injunctive relief is feasible and necessary, and the benefit to the general public, as well as to Global, far outweighs any inconvenience to Equitas.

WHEREFORE, Global demands judgment against defendants as follows:

(1)    On the First Cause of Action, awarding Global compensatory damages in the amount of $20.8 million, together with interest on the unpaid balances;

(2)    On the Second Cause of Action, awarding Global threefold the damages sustained by reason of Equitas's violations of the Donnelly Act, amounting to at least $62.4 million, plus interest, attorneys' fees, and costs;

(3)    On the Third Cause of Action, enjoining Equitas from continuing to engage in the tortious practices described herein; and

(4)    Awarding such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated:    New York, New York
          March 14, 2007

CAHILL GORDON & REINDEL

By: _____
         Edward P. Krugman

*Attorneys for Plaintiffs*
Office & P.O. Address:
80 Pine Street
New York, New York  10005
(212) 701-3000

CERTIFICATION OF SERVICE

    This is to certify that the foregoing Affidavit was sent, via FedEx,  on this
3rd day of August, 2007, to the following counsel of record:

Joseph J. Schiavone, Esq.
Jeffrey S. Leonard, Esq.
Budd Larner, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey  07078

_____
Dan E. LaBelle

1020590-1(HSFP)

1015985