UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In the Matter of the Arbitration Between | * * * | Docket No. 07 CV 6222(SHS) |
| ARGONAUT INSURANCE COMPANY, | * * | |
| Petitioner, | * * | |
| - against - | * * | **FILED UNDER SEAL** |
| GLOBAL REINSURANCE CORPORATION - U.S. Branch, | * * * | |
| Respondent/ Counter-Petitioner, | * * * | |
| - against - | * * | |
| ARGONAUT INSURANCE COMPANY, | * * | |
| Respondent on Counter-Petition. | * * * | |

**MEMORANDUM OF LAW OF PETITIONER/COUNTER-RESPONDENT ARGONAUT INSURANCE COMPANY IN OPPOSITION TO GLOBAL REINSURANCE CORPORATION – U.S. BRANCH'S AMENDED COUNTER-PETITON AND REQUEST FOR RELIEF IN AID OF ARBITRATION**

## Table of Contents

Table of Authorities ............................................................................ii

INTRODUCTION .................................................................................1

      Preliminary Statement.................................................................1

      Procedural Posture ....................................................................1

      Factual Background....................................................................3

ARGUMENT .......................................................................................6

I.     New York Law Applies to this Dispute ......................................6

II.    Global Should not be Permitted to Avoid the Finality of the Quota Share
       Arbitration Award ......................................................................11

III.   An Arbitrator's Fitness to Serve can be Challenged Prior to the Arbitration
       Under New York Law ................................................................15

IV.   Richard White is not a Proper Arbitrator in this Matter and Argonaut
       Should be Permitted to Select a Suitable Replacement ............17

      CONCLUSION .........................................................................21

## Table of Authorities

*Blistein v. Felderman*, 154 A.D.2d 416 (N.Y. App. Div. 1d 1989)........................17

*Borden v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822 (2d Cir. 1990).......................10

*Collins & Aikman Prods. Co. v. Building Sys., Inc.*, 58 F.3d 16, 19
(2d Cir. 1995).................................................................................................12, 13

*Fahnestock & Co. v. Waltman*, 935 F.2d 512 (2d Cir. 1991)...............................7, 8

*Federated Rural Elec. Ins. Exchange v. Nationwide Mut. Ins. Co.,* 134 F.Supp.2d
923 (S.D. Ohio 2001) ....................................................................................13, 14

*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920
(1995) ...................................................................................................................13

*Grapetree Shores, Inc. v. Ehleiter*, 2006 WL 889230 (D.V.I. 2006) .....................14

*In Re Excelsior*, 218 A.D.2d 528 (N.Y. App. Div. 1d 1995) ...........................18, 19

*In Re Home Ins. Co.*, 908 F.Supp. 180 (S.D.N.Y. 1995) ......................................13

*Island Territory of Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313
(Ct. App. N.Y. 1973) ..............................................................................................9

*Marc Rich & Co. v. Transmarine Seaways Corp.,* 443 F.Supp. 386
(S.D.N.Y. 1978) ....................................................................................................16

*Marie v. Allied Home Mort. Corp.*, 402 F.3d 1 (1st Cir. 2005) ..............................14

*Matter of Astoria Med. Group*, 11 N.Y.2d 128 (N.Y. 1962) ..................................18

*Metropolitan Property and Casualty Ins. Co. v. J.C. Penney Casualty Ins. Co.,*
780 F.Supp. 885 (D.Conn. 1991) ....................................................15, 16, 17, 19

*National Union Fire Ins. Co. v. Belco Petroleum Corp.,* 55 F.3d 129
(2d Cir. 1996) .......................................................................................................14

*Paine Webber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996) ....................................13

*Pan Atlantic Group, Inc. v. Republic Ins. Co.*, 878 F.Supp. 630
(S.D.N.Y. 1995) ................................................................................................8

*Pine Val. Prods. v. S.L. Collections*, 828 F.Supp. 245 (S.D.N.Y. 1993) ...............7

*Reidy v. Cyberonics, Inc.*, 2007 WL 496679 (S.D. Ohio 2007) ...........................14

*Scherk v. Alberto-Culver Co.*, 417 U.S. 506 (1974) .............................................8

*Tristar v. Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.*, 97 Fed.Appx. 462
(5th Cir. 2004) ................................................................................................14

*Uniformed Firefighters v. City of Long Beach*, 307 A.D.2d 365
(N.Y. App. Div. 2d 2003) ...............................................................................17

*United States Fire Ins. v. National Gypsum Co.*, 101 F.3d 813
(2d Cir. 1996) ..................................................................................................14

*Venconsul, N.V. v. Tim Intern, N.V.*, 2003 WL 21804833
(S.D.N.Y. Aug. 5, 2003) ..............................................................................9, 10

*Volt Information Sciences v. Lelan Stanford Jr. Univ.*, 489 U.S. 468 (1989) ........7

## **Other Authorities**

Kamiaiko, Laurie A., *Reinsurance Arbitrations*, Practicing Law Institute, 14th
Annual Insurance, Excess and Reinsurance Coverage Disputes
(January 1997) ...............................................................................................11

## INTRODUCTION

**Preliminary Statement**

Despite Global's attempts to make this matter overly complicated, which it apparently hopes will tempt the Court to send the parties to arbitration again, it is actually very simple.   Global lost an earlier arbitration in which it sought (under the same two contracts at issue in this matter) to collect from Argonaut a portion of the amount it paid to commute with two of its former cedents – the Home Insurance Company ("Home") and the members of the American International Insurance Group ("AIG") (hereinafter the "First Quota Share Arbitration").  When the First Quota Share Panel would not reconsider its decision and transform the loss into a win for Global, Global decided it would bring a second arbitration and try again.  Global proceeded to appoint the same arbitrator it appointed in the First Quota Share Arbitration in its second attempt to recoup a portion of the commutation payments it made to its former cedents, AIG and Home.  Global's attempt at serial arbitrations is an abuse of the system that should not be allowed no matter what law is applicable to this matter.

**Procedural Posture**

As Argonaut has noted in its Motion to Remand, Global's pleadings in the instant case are contradictory to its recent pleadings in another matter filed in this same District with regard to its corporate status and principal place of business. As discussed in Argonaut's Memorandum of Law in support of its Motion to Remand, Global presents no clear picture of its corporate status or principal place of business.  The confusion attending Global's contradictory assertions

about its principal place of business and hence its citizenship in turn breeds
confusion with respect to the existence of subject matter jurisdiction in this Court
and the choice of law principals which should be applied to this case.

Argonaut filed a special proceeding in the New York Supreme Court for
New York County requesting confirmation of the award in the First Quota Share
Arbitration.[1]  The majority award in the First Quota Share Arbitration found that
Global could not collect the portions of its commutations with AIG and Home from
Argonaut.  In the State Court proceeding, Argonaut also requested that the court
permanently stay Global's attempt to institute a new arbitration to collect its AIG
and Home commutation balances from Argonaut.

In the event that the State Court did not grant a permanent stay, Argonaut
requested as alternative relief that Global be prevented from using Richard L.
White, its party-appointed arbitrator in the First Quota Share Arbitration, as its
arbitrator in the newly-demanded arbitration which involves an attempt to recoup
its commutation payments to AIG and Home under the same quota share
contracts.  When Global refused to appoint a new arbitrator to replace Mr. White,
Argonaut appointed Ronald Gass for Global, unaware that Mr. Gass had served
as a party-appointed arbitrator against Global more than ten times.  In the State
Court proceeding, Argonaut requested that the court confirm the appointment of
Mr. Gass.  After Global named Mr. Gass as a respondent in this matter, he
requested that his name be withdrawn from consideration.  Global has now

---

[1] Argonaut will not re-brief these motions as they are before the Court, attached to Global's
Notice of Removal.  To the extent that the Court does not grant Argonaut's motion to remand,
Argonaut renews those motions before this Court.

dropped Mr. Gass from this matter, but has not appointed a replacement for Mr. Gass. Argonaut should be allowed to appoint a replacement for Mr. Gass.

**Factual Background**

Global lost the Quota Share arbitration. As Global disagreed with the Panel's ruling that it could not cede its commutation payments to Argonaut, Global decided it would again demand arbitration over new billings that it has or plans to submit to Argonaut arising out of the same contracts that it commuted with its former cedents, Home and AIG. Global has submitted bills to Argonaut that purport, once again, to cede part of its commutation payments.

The Court does not have to dissect the testimony in the First Quota Share Arbitration to determine any of the issues before it   The Panel's award in that arbitration says it all. All of the testimony that Global quotes from the First Quota Share Arbitration was before that Panel when it made its decision. This Court does not need to look beyond that decision – Global sought to recover a portion of its commutation payments to AIG and Home and the Panel held it could not. As Global says in its own pleadings, a commutation fully and finally resolves any obligations that Global had to its cedents. [*See* Exhibit 1 to Affidavit of Christopher Hollender in Support of Argonaut's Motion to Stay Arbitration or for Alternative Relief] Global has now re-packaged part of its commutation payments to AIG and Home and seeks to collect on these re-packaged commutation payments in its newly-filed arbitration. Global should be prevented from re-arbitrating the full and final arbitration award in the First Quota Share Arbitration.

To the extent the Court wants to look beyond the award in the First Quota Share Arbitration, Argonaut sets forth below responses to the various factual mischaracterizations and admissions in Global's pleadings.

In the First Quota Share Arbitration, Argonaut maintained that Global behaved in bad faith vis-à-vis Argonaut with regard to its handling and billing of the portion of the AIG and Home commutation payments it sought to recover from Argonaut.    Rhonda Ijams, President of Insurance Run-off Consultants, Argonaut's run-off facility, testified at length before the Panel and explained what Argonaut's position was with respect to the commutation billings submitted by Global.[2]  also very clear in her testimony that Argonaut was asking the Panel to rule that Argonaut did not have to pay Global's commutation claims.  "Q:  Miss Ijams, you are hoping that the panel will let Argonaut off the hook, so to speak, and not pay the billings that are at issue in this arbitration, aren't you?  A:  Yes."  [Ijams Testimony at 1500:4-8.]  Global's relationship with Home and AIG has been concluded.

As clearly testified to by Ms. Ijams, Argonaut's position was that Global behaved in derogation of the contract terms and in bad faith in ceding the commutations to Argonaut.

> Q:  Now, switching to Global has accused Argonaut of bad faith in
> this matter, but do you consider that Global acted in bad faith with
> regard to its cessions of the commutation payments?
> A:  I think that, as a starting point, Gerling put their own self-
> interests ahead of everyone else's, and I think that's an indication
> of bad faith in the reinsurance relationship.  It is meant to be a
> relationship, a partnership, a business relationship, but I believe

---

[2] The transcript of Rhonda Ijams arbitration testimony is reproduced as Exhibit D to Global's July 16, 2007 Verified Counter-Petition  References to Ms  Ijams testimony will hereinafter be made as "Ijams Testimony" followed by the transcript page and line numbers

that is what happened here. It was all about Gerling, "and then we'll let everybody else in on it later."

Q: Well, is part of your basis for believing that the way in which the notice was handled or not in this matter?

A: Yes. My opinion is, based on what I have seen and heard this week and prior, that Gerling gave priority to their own self-interest. They did not plan on giving any notice whatsoever to their reinsurers, either before these deals were done, after they were done, to the point that Navigant did their re-al -- their allocation. They intended to give notice after all of that was put in place, then they were going to, you know, unveil it. That, to me, I don't think is certainly not a good business partnership or good faith.

Q: Now, were you also concerned, in relationship with bad faith, about the reclassification of -- in the presentation of claims as paid claims when it was actually IBNR?

A: Absolutely. And that's why I think it's important -- it's important at any point in time. Business needs to be accurate. You don't need Sarbanes to tell you that. Sarbanes put in more procedures and more documentation requirements and so on and so forth, but your business records should be accurate, and I don't believe that's what they did.

Q: Now, on methodology, do you have concerns as to how and why they adopted the methodology they did in allocating?

A: I believe that the intent was to overcome the issues that Vince Potts identified, at least the second one. Not only are you going to get challenged on acceleration by the retrocessionaires, you're going to get challenged on moving IBNR into claims. I believe that's wrong. That's bad faith. [Ijams Testimony at 1484:24-1487:4.]

All of the testimony quoted by Global in its Memorandum of Law herein

are Ms. Ijams' responses to hypothetical questions regarding arrangements that

might have been worked out between the parties had Global given Argonaut

notice and an opportunity for input. Her testimony on that is very clear:

The point here isn't a windfall, the point is that Gerling has made its own business decision and taken the business risk associated with retrocessional recovery, and it's done so without notice and without an opportunity for Argonaut to participate. It didn't find out the answer to whether Argonaut would support or whether Argonaut would require continued billing. [Counsel/Panel colloquy.] My answer is -- my answer is no, I don't believe it's a windfall. [Ijams Testimony at at 1507:18-1508:23.]

She again stated her point of view with regard to this entire hypothetical line of

questioning:

> Q: And my question to you, very simply, is whether it would be a
> windfall to Argonaut if Home and AIG were not willing to continue to
> bill Global and Argonaut, therefore, avoided – was able to avoid
> any liability for its share of the Home and AIG books of business
> that it reinsured through Global?
>
> A. I don't view windfalls. I'm not behind that word. I'm not getting
> why you think that's a windfall. Business is business, and – you
> know, you're giving me a hypothetical or an assumption or
> something; what if they wouldn't do it? Why didn't you ask me?
> We could have asked them at the time. You know – you're looking
> at windfalls, and I'm looking as "Wait a minute, we have a
> relationship here." I don't view this as a windfall. I don't know
> whether because they wouldn't continue to report or not, Gerling
> would have some other manner of continuing to present, I don't
> know. All I know is I didn't get an opportunity to talk about it. [Ijams
> Testimony at 1509:17-1510:14.]

Far from laying out some sort of approach that would allow Global to

repackage cessions for which recovery had already been denied, Ms. Ijams'

testimony went to the basic unfairness of Global's approach to its

retrocessionaires in the method it handled and ceded the commutations.

## ARGUMENT

### I.    New York Law applies to this dispute

Global's arguments regarding choice of law are faulty, and are based

upon unsupported claims relating to Global's citizenship. These claims fly in the

face of Global's own representations, before this Court and elsewhere. In the

section of its Memorandum in which it addresses applicable law, Global relies

completely on an assertion that U.S. Branch "is a German citizen with its

principal place of business in Cologne Germany." [Memorandum at 9.] This

contradicts Global's recent representations to this Court that its principal place of business is New York and also goes beyond the sworn explanation in its Counter-Petition to Confirm Arbitral Award and for Relief in Aid of Arbitration herein.

As set forth in Argonaut's Memorandum of Law in Support of its Motion to Remand herein, Global's self-characterization is inconsistent with Global's most recent pleadings in the Southern District of New York, which for the purposes of diversity jurisdiction therein, describe Global as having "its principal place of business at 1345 Avenue of the Americas, New York, New York." [See Affidavit of Dan E. LaBelle in Support of Argonaut's Motion to Remand, Exhibit 1 ¶ 3 Global's Counter-Petition in Alternative to Confirm Arbitral Award filed in 07 Civ. 2521 (HB) on April 11, 2007; see also Exhibit 2 ¶ 3 to Global's Response to Petition to Confirm in Part and Vacate in Part Arbitral Award, filed on the same date in the same matter.]

In addition, Global's pleadings herein have been inconsistent. In its Amended Counter-Petition (the only Global pleading verified by a party declaration), U.S. Branch is carefully described as "a branch of a foreign reinsurance company organized and existing under the laws of Germany, with its principal place of business in Cologne, Germany." [Counter-Petition at ¶3.] So while the Memorandum claims that the principal place of business of U.S. Branch is Cologne, the party declaration only goes as far as to swear to the principal place of business of U.S. Branch's parent.

Further, even if the FAA does apply, it does not preempt New York law where there is no contradiction between the two. *Volt Information Sciences v. Leland Stanford Jr. Univ.*, 489 U.S. 468 (1989); *Pine Val. Prods. v. S.L. Collections,* 828 F.Supp. 245 (S.D.N.Y. 1993) (Where New York law does not conflict with Federal Arbitration Act (FAA), it is to be applied); *Fahnestock & Co. v.* Waltman, 935 F.2d 512 (2d. Cir. 1991) (state law may be applied in arbitration matters, subject to preemption only to the extent that it actually conflicts with federal law).

Although Global pointed out that the FAA does not explicitly provide for pre-arbitration arbitrator challenges, neither does it prohibit such a practice by a court. Nor does the FAA explicitly prohibit judicial application of res judicata where, as here, a party is seeking to abuse the arbitration process by taking multiple bites at the apple. Accordingly, the FAA does not preclude pre-arbitration analysis of an arbitrator's fitness to serve, nor does it preclude judicial application of res judicata to a prior arbitration award confirmed by the court. Moreover, as discussed below, at least one Federal Court has ordered that such a challenge be heard under the FAA, in a situation very similar to the case at bar.

Like the FAA, the Convention on Recognition and Enforcement of Foreign Arbitral Awards does not here preempt New York law. Upon remanding a case to the Supreme Court of the State of New York that was untimely removed under the Convention, this Court identified the goals of the Convention as articulated by the Supreme Court. *Pan Atlantic Group, Inc. v. Republic Ins. Co.*, 878 F.Supp. 630 (S.D.N.Y. 1985).

8

> *The goal of the Convention,* and the principal purpose underlying
> American adoption and implementation of it, *was to encourage the
> recognition and enforcement of commercial arbitration agreements*
> in international contracts and to unify the standards by which
> agreements to arbitrate are observed and arbitral awards are
> enforced in the signatory countries.

Scherk v. Alberto-Culver Co., 417 U.S. 506 at 52094 S. Ct. 2449 (1974).

These two goals – enforcement of arbitration agreements and
enforcement of arbitration awards – are not in conflict with application of New
York law. Further, there is nothing in the Convention that suggests conflict with
New York law as applied here – namely, for this Court or a New York State court
to now address (1) the res judicata and collateral estoppel effects of the prior
arbitration, and (2) Mr. White's fitness to sit as an arbitrator in an arbitration
regarding an award which he deliberated over and to which he dissented and an
order which he deliberated over and to which he dissented.

Additionally, the New York Court of Appeals has held that the Convention
does not preempt New York statute, even in a field in which both would apply.
"The Convention on Recognition in no way purports to prevent states from
enforcing foreign money judgments, whether those judgments are rendered in
the enforcement of an arbitration award or otherwise." *Island Territory of
Curacao v. Solitron Devices, Inc.*, 489 F.2d 1313 (Ct. App. N.Y. 1973) (Federal
law implementing Convention on Recognition and Enforcement of Arbitral
Awards does not preempt New York state law to extent that it permits, regulates
and establishes a procedure for enforcement of foreign money judgment; thus,
policy of New York to recognize foreign judgments prevails in absence of
interference with federal regulatory scheme.)

9

In *Venconsul, N.V. v. Tim Intern, N.V.,* 2003 WL 21804833 (S.D.N.Y. Aug.

5, 2003), this Court stated that "seeking equitable remedies in connection with

arbitration is consistent with the Convention's 'provisions and ... spirit,' ...

because 'the desire for speedy decisions in arbitration is entirely consistent with a

desire to make as effective as possible recovery upon awards, after they have

been made, which is what provisional remedies do.'" *Id* at *7, quoting *Borden v.*

*Mieji Milk Prods. Co., Ltd.,* 919 F.2d 822 (2d Cir. 1990). In the present case,

both the motion for stay and the alternative motion to disqualify Mr. White from

serving as arbitrator dovetail with effectuating the last arbitration on one hand,

and alternatively making effective the award in any subsequent arbitration on the

other. Equitable relief in the form of the stay is consistent with the Convention's

desire to make the prior arbitration effective, rather than give Global an

opportunity to re-arbitrate the same issue upon which it previously lost. Thus, it

effectuates the previous award without requiring another arbitration to do so.

Alternatively, it is efficient for the court to hear the arbitrator issue now in order to

effectuate the next arbitration, which would otherwise be conducted under a

cloud of uncertainty, and which would then be subject to subsequent litigation

and possible re-arbitration, once again.

> Even where federal arbitration law governs, state law applies to
> those issues not preempted by federal law, i.e. where federal law is
> silent on an issue, state law applies. Thus, where the issue is the
> meaning of the arbitration agreement and its intent to include the
> issue in dispute, "general state law principles of contract
> interpretation" apply regardless of whether the arbitration is
> otherwise subject to federal arbitration law. *RLI Insurance Co. v.*
> *Kansa Re*, 1991 U.S. Dist. LEXIS 16388 (S.D.N.Y. 11/14/91).
> Accord, *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 131
> L.Ed.2d 985, 115 S.Ct. 1920 (1995); *Doctor's Associates v.*

> *Casarotto*, supra. See also *Progressive Cas. v. C.A.*
> *Reaseguradora Nacional*, 991 F.2d 42 (2d Cir. 1993) (holding
> federal law governs the enforcement of an agreement to arbitrate,
> but the determination as to whether the parties agreed to arbitrate
> an issue is a question of state law, and a federal court whose
> jurisdiction is based on diversity will apply the choice of law rules of
> the state in which the action is brought); *Astro Vencedor Compania*
> *Vaviera v. General Organization*, supra (holding that as the FAA
> does not specify any statute of limitations, the court in considering
> the timeliness of an application to compel arbitration "must borrow
> the most closely analogous state law").

Kamiaiko, Laurie A., *Reinsurance* Arbitrations, Practicing Law Institute,

14th Annual Insurance, Excess and Reinsurance Coverage Disputes (January

1997). Accordingly, the Convention, the FAA, and New York law can co-exist

and preemption is not an issue in this matter.


## II.     Global Should not be Permitted to Avoid the Finality of the Quota Share Arbitration Award

The brief that Argonaut filed in the State Court in support of its motion

outlines the issue of res judicata and its application to Global's second arbitration

demand. [*See* Argonaut's Memorandum of Law in Support of Motion to Stay

Arbitration or for Alternative Relief, pp.5-10.] The cases cited therein have not

been overruled.

Global argues that the arbitration clauses in the contracts are so broad

that they encompass its attempted re-arbitration of the January 2007 award.

This is not so. The arbitration clauses in both contracts anticipate disputes

between the parties that will not be arbitrable as both indicate that, "As a

condition precedent to any right of action hereunder" certain disputes will be

arbitrated. [*See* Affidavit of Christopher Hollender in Support of Argonaut's

11

Motion to Stay Arbitration or for Alternative Relief, exhibit 3 (Quota Share contract) and exhibit 4 (First Surplus contract).]

The arbitration clause in the Quota Share contract addresses only "disputes [that] arise out of this Agreement, as well as differences, concerning the validity of the Agreement." [Id.]    Although Global styles its March 2007 arbitration demand as arising under the contracts, it is actually seeking a declaratory judgment invalidating the January 2007 award. [See Affidavit of Christopher Hollender in Support of Argonaut's Motion to Stay Arbitration or for Alternative Relief, Exhibit 9]

Also both clauses contain a specific limitation that is of specific application in this matter – the provision that an award once issued is "final and binding" on the parties. The language of the Quota Share contract also provides that the arbitrators' decision is "not subject to appeal." [See Affidavit of Christopher Hollender in Support of Argonaut's Motion to Stay Arbitration or for Alternative Relief, Exhibit 3 at Article IX (3) and Exhibit 4 at Article XIII (B).]

Both parties agree that the First Quota Share Arbitration Award should be confirmed; the parties disagree under which law the confirmation should be entered. It is telling that Global did not seek to vacate the First Quota Share Arbitration panel's award, but to attack that award in a different manner – by seeking a second bite at the apple in a second arbitration.

Whether an agreement to arbitrate governs a particular dispute is essentially a matter of contract interpretation. See Collins & Aikman Products

12

*Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995)("Federal arbitration policy

respects arbitration agreements as contracts that are enforceable in the same

way as any other contract."); see also In Re *Home Ins. Co.*, 908 F.Supp. 180,

183 (S.D.N.Y. 1995). Unless the parties have clearly agreed otherwise, a court,

rather than an arbitrator, determines whether the parties did, in fact, agree to

arbitrate a dispute. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938,

115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *PaineWebber Inc. v. Bybyk*, 81 F.3d

1193, 1198 (2d Cir.1996). In *First Options*, the Supreme Court held that "[c]ourts

should not assume that the parties agreed to arbitrate arbitrability unless there is

'clear and unmistakable' evidence that they did so," further noting that the

traditional presumption in favor of arbitration when determining whether a

particular dispute is arbitrable is reversed. *First Options,* 514 U.S. at 944-45

(citations and alterations omitted).

　　　In practice, federal courts have refused to let dissatisfied parties "appeal"

arbitration awards. In *Federated Rural Elec. Ins. Exchange v. Nationwide Mut.*

*Ins. Co.*, 134 F. Supp.2d 923, 926 (S.D. Ohio 2001), a case quite similar to the

one at bar, the court declined to compel a second arbitration interpreting the

contracts at issue as follows:

> Federated and Nationwide agreed to submit disputes arising from
> the reinsurance treaties to arbitration, and that was what occurred
> and gave rise to the 1996 arbitration award. The parties did not,
> however, agree to re-arbitrate, or appeal the award issued by the
> arbitrators, nor did the parties agree to arbitrate the finality of any
> award issued by the arbitration panel. Id. at 927.

Nationwide argued that Federated had to arbitrate the applicability of the "final

and binding" language in the arbitration clause, but the court disagreed:

13

> According to Nationwide, the issue of finality of the prior arbitration award should be determined in another arbitration proceeding. *Nationwide's argument, carried to its logical conclusion, would render meaningless the provision of an arbitration agreement which says that the results of the arbitration shall be final and binding.* If the parties can never resort to a court for enforcement of this provision, the only limit on the losing party's ability to continuously request the arbitrators to reconsider their award, would be its ability to conjure up new arguments as to why their original award was erroneous. Id. at 928 (emphasis original).

This Court, like the *Nationwide* court, should refuse to let Global avoid the finality of an award that it never attacked and agreed should be confirmed.

Global's arguments rely heavily on *National Union Fire Ins. v. Belco Petroleum Corp.,* 88 F.3d 129 (2d Cir. 1996) and *United States Fire Ins. v. National Gypsum Co.,* 101 F.3d 813 (2d cir. 1996). However, those cases are distinguishable from the case at issue because there is nothing in either of those cases that smacks of abuse of the arbitration process, nor the attempt to avoid the finality of an award. The situation before this Court is more analogous to the line of cases following *Marie v. Allied Home Mort. Corp.*, 402 F.3d 1,11-15 (1st Cir. 2005), which decided that courts were the more appropriate forum for determining whether a party had waived its right to arbitrate based on its conduct in litigation. *See also Tristar v. Fin. Ins. Agency, Inc. v. Equicredit Corp. of Am.,* 97 Fed. Appx. 462, 464 (5th Cir. 2004); *Reidy v. Cyberonics, Inc.,* 2007 WL 496679 (S.D. Ohio Feb. 8, 2007). The holding of the *Marie* court was based in part on its concerns of procedural abuse. 402 F.3d at 13. *See also Grapetree Shores, Inc. v. Ehleiter*, 2006 WL 889230 at 6 (D.V.I. March 24, 2006)(discussing *Marie* case and courts' role in preventing procedural abuses). The situation presented to this Court is similar to the *Marie* line of cases where the courts

decided that it was their place, not the arbitration panel's, to prevent procedural
abuses. This Court should enforce the finality of the award of the First Quota
Share Arbitration Panel and prevent Global from filing serial arbitrations designed
to re-arbitrate the results of the First Quota Share Arbitration.

## III.    An Arbitrator's Fitness to Serve can be Challenged Prior to the Arbitration Under New York Law

In *Metropolitan Property and Casualty Ins. Co. v. J.C. Penney Casualty
Ins. Co.*, 780 F.Supp. 885 (D. Conn. 1991), the U.S. District Court for the District
of Connecticut, applying the FAA in conjunction with state law, heard argument
prior to an arbitration on Metropolitan Property ("Met")'s motion to disqualify an
arbitrator prior to the arbitration. As here, the defendants there argued that
enjoining the arbitrator "conflicts with the overriding policy objective of arbitration
law 'to permit a just and expeditions result with a minimum of judicial
interference.'" *Metropolitan Property*, 780 F. Supp. at 893. The court rejected
that argument, stating:

> "it is more likely, indeed a virtual certainty, that Met will seek to
> vacate any award, short of total victory, that McNamara participates
> in once the arbitration concludes. Thus, Met will litigate the
> propriety of McNamara's conduct *after* the arbitration even if it is
> precluded from disqualifying him *prior* to the process. In light of this
> reality, it simply does not follow that the policy objective of an
> expeditions and just arbitration with minimal judicial interference is
> furthered by categorically prohibiting a court from disqualifying an
> arbitrator prior to arbitration. *Astoria Medical Group v. Health Ins.
> Plan of Greater N.Y.*, 11 N.Y.2d 128, 227 N.Y.S.2d 401, 182 N.E.2d
> 85 (N.Y.Ct.App. 1962); *Gaer Brothers, Inc. v. Mott*, 144 Conn. 303,
> 130 A.2d 804 (1957). Here, the parties will not only suffer the delay
> produced by litigation seeking to vacate the award after the
> arbitration, but risk the additional loss of time and money if the court
> finds in Met's favor. Should Penney prevail on the merits of its
> claim and the court follow Penney's approach of granting relief only
> *after* the arbitration concludes, Met would be entitled to vacate the

> award and the parties will then have to go through the entire
> arbitration process all over again before a different arbitration
> panel.[3]

> Under these circumstances, it seems senseless to require both
> parties to 'submit to a prolonged, costly proceeding ... [when] this
> unfair burden can readily be avoided upon proof, in this action....
> The 'just' and 'expeditious' policy, therefore, would be to evaluate
> Met's claims on the merits of its action for injunctive relief *prior* to
> arbitration rather than have the parties waste their time, energy,
> and money by participating in a potentially tainted process.

*Metropolitan Property*, 780 F. Supp. at 894-95, (emphases in original) (internal

citations omitted).

Also identical to Global's argument here, the defendant in *Metropolitan*

*Property* argued that it had support in Second Circuit cases "for the contention

that courts cannot enjoin an arbitrator prior to the completion of arbitration"

(*Metropolitan Property,* 780 F.Supp. at 894), but the court distinguished the

cases cited by the defendants – including a case heavily relied upon by Global,

*Marc Rich & Co. v. Transmarine Seaways Corp.*, 443 F. Supp. 386 (S.D.N.Y.

1978) – stating that the Second Circuit's "conclusion that the FAA 'does not

provide for judicial scrutiny of an arbitrator's qualifications to serve, other than in

a proceeding to confirm or vacate an award,' was made in the context of finding

that there is no basis 'statutory or otherwise ... that grants courts the power to

force unwilling arbitrators to serve.' Here, Met does not seek to force McNamara

---

[3] Global's behavior with regard to the Quota Share commutation billings creates a seemingly
endless pattern of arbitration and litigation, which could be curtailed by addressing the issue of
whether to disqualify Mr. White before the arbitration, if such an arbitration proceeds. Should an
arbitration proceed and should Argonaut be unsatisfied with the Award, it would then challenge
the arbitration, which would lead to litigation at that point, and potentially a subsequent arbitration
should Mr. White be disqualified after the fact. There is no logical reason for Global to oppose
addressing this issue before any arbitration, as the subsequent litigation would consume
resources not only of the courts and Argonaut, but also of Global.

to serve as an arbitrator. To the contrary, it seeks to disqualify him."

*Metropolitan Property,* 780 F.Supp. at 895 (internal citations omitted).

> Further, the *Metropolitan Property* discussed *Astoria Medical Group
> v. Health Ins. Plan of Greater N.Y.*, where "the New York Court of
> Appeals, a jurisdiction well versed on the subtleties and
> complexities of arbitration law, stated: 'we are persuaded that, in an
> appropriate case, the courts have inherent power to disqualify an
> arbitrator before an award has been rendered. Significantly, the
> Second Circuit has noted 'that the federal act is modeled
> substantially' on New York's arbitration law."

*Metropolitan Property*, 780 F.Supp. at 895 (internal citations omitted).

Even if the FAA and the Convention apply, they do not preempt New York

law because there is no conflict between the two. Under New York law, pre-

arbitration challenges to arbitrators are properly heard before the arbitration,

particularly in cases such as this, where the impropriety is clear and egregious.

Accordingly, Argonaut requests that, if the Court does not grant Argonaut's

Motion to permanently stay the arbitration, it address prior to the arbitration the

impropriety of Global's appointment of Richard White as arbitrator.

## IV. Richard White is not a Proper Arbitrator in this Matter and Argonaut Should be Permitted to Select a Suitable Replacement.

"The standard of review for the disqualification of arbitrators is whether the

arbitration process is free of the appearance of bias." *Uniformed Firefighters v.

City of Long Beach*, 307 A.D.2d 365 (N.Y. App. Div. 2d 2003), *quoting Blistein v.

Felderman*, 154 A.D.2d 416 (N.Y. App. Div. 1d 1989). As set forth above and

below, Arbitrator White's participation in this arbitration would create such an

appearance, as he has already opined, in his dissents on the very issues that

Global now seeks to arbitrate. In Mr. White's second dissent, he clarifies his first

dissent as follows: "The Dissent did not mean that relief from the responsibility by virtue of the Panel's Award, permanently relieved Argonaut of responsibility for the actual value of the AIG and Home future claim payments and settlements billed by Global pursuant to the provisions of the Retrocessional Agreements." (See Hollender Aff. in Support of Argonaut's Memorandum of Law in Support of its Motion to Stay Arbitration or for Alternative Relief, hereinafter "Hollender Aff.," ¶13, Ex.8.)  This is exactly the issue that Global seeks to arbitrate in its second arbitration demand:  "Whether, pursuant to the 10 January 2007 Award in the Quota Share Arbitration between the parties, U.S. Branch is entitled to bill Argonaut in the future as claims actually develop on the underlying reinsurance agreements between U.S. Branch and AIG and between U.S. Branch and Home."  (See Id. ¶15, Ex. 9.)

With respect, Mr. White has already made up his mind on this issue and expressed his opinion in writing.  With facts very similar to those in this case, the *In Re Excelsior*, 218 A.D.2d 528 (N.Y. App. Div. 1d 1995) court relied upon the party-appointed arbitrator's "comments concerning the prior arbitration … and his precarious position of having already heard the evidence" in determining that "he [could] not fairly hear the evidence" *Id.* at 531.

Under New York law, an arbitrator should be disqualified if he will be unable to "faithfully and fairly hear and examine the matters in controversy [because of] evident partiality."  *Id* at 531, *quoting Matter of Astoria Med Group [Health Ins. Plan], supra*, 11 N.Y.2d 128 at 137 (N.Y. 1962).  The *Excelsior* court applied this standard even to a party-designated arbitrator reasoning that "such

arbitrators are [not] excused from … the obligation to participate in the arbitration process in a fair, honest and good faith manner." *Id. quoting Metropolitan Prop. & Cas. Ins. Co. v. J.C. Penney Cas. Ins. Co.*, 780 F.Supp. 885, 892.

As set forth above, Richard White served as an arbitrator in the First Quota Share Arbitration, the award from which Global seeks to have reviewed in its subsequent arbitration, and issued written dissenting opinions that clearly reflect not merely a predisposition towards the positions Global is advancing in the subsequent arbitration, but articulate in a written decision that he has already made his mind up on the same issues Global seeks to arbitrate in its newly-filed arbitration . He has already heard the evidence presented in the First Quota Share Arbitration, and cannot view a subsequent arbitration with disregard of that evidence, especially in light of the fact that he has already issued written opinions that address the issues that Global seeks to raise in the subsequent arbitration. Further, if Global's newly-filed arbitration, which seeks to interpret the award of the Quota Share panel, is allowed to go forward in spite of the fact that the issues have already been litigated, Mr. White may be a potential fact witness. If confidentiality concerns prevent Mr. White and the other arbitrators from testifying regarding the deliberations of the Quota Share panel, then it is inherently unfair for Mr. White, with a monopoly on first-hand knowledge of that panel's deliberations, to serve as a party-appointed arbitrator in the subsequent arbitration.

Global mischaracterizes Argonaut's challenge of Mr. White. Global's contention that Argonaut's challenge to White is "because he sat on other

arbitration panels" does not accurately state Argonaut's position. While it is true that Mr. White has sat on at least five arbitration panels on behalf of Global relating to the commutation payments that it seeks to cede to Argonaut, Argonaut does not here challenge White "because he sat on other arbitration panels."[4] Accordingly, Global's analogy of Mr. White's service on the underlying Quota Share panel and dissenting opinions that respond nearly verbatim to Global's collateral arbitration demand on the one hand, and Argonaut's arbitrator's service on one other commutation-related arbitration not at issue here on the other, is utterly absurd and without merit.

Further, Global's request that the Court permit it an opportunity to replace Mr. White should be denied. Argonaut presented Global with an opportunity to replace Mr. White, and Global refused. Although the Arbitrator appointed by Argonaut on behalf of Global has recently rejected the appointment, it should be up to Argonaut to appoint a suitable replacement, as Global failed to appoint an appropriate arbitrator within the time provided by the contracts.

---

[4] Although it would likely have had a strong argument for doing so, Argonaut did not challenge Global's serial appointments of Mr. White on all of the commutation arbitration panels. Argonaut here challenges Mr. White's appointment to this panel because of Mr. White's participation in the underlying arbitration, the award from which Global seeks to collaterally attack through a subsequent arbitration. As discussed, Mr. White's decisions with regard to the "issues" set forth by Global in this most recent arbitration have already been put in writing in Mr. White's dissents to the Award and to the Quota Share panel's ruling on Global's purported motion for clarification.

## **CONCLUSION**

For the foregoing reasons, Argonaut respectfully requests that if

Argonaut's Motion to Remand is not granted, this Court:

(1) confirm the Quota Share Arbitration Award; and

(2) grant Argonaut's Motion for a Permanent Stay and deny Global's
Petition to order Argonaut to proceed with the March 2007 Arbitration; or in the
alternative

(3) grant Argonaut's Motion to Disqualify Arbitrator White from serving on
the March 2007 Arbitration Panel and deny Global's Petition for an injunction
requiring Argonaut to proceed with the arbitration with White as Global's party-
appointed arbitrator;

(4) deny Global's request for attorneys' fees and costs; and

(5) grant Argonaut any additional relief as the Court sees fit.


Dated:      Westport, CT
            August 7, 2007


                              HALLORAN & SAGE LLP



                              Dan E. LaBelle, DL2779
                              HALLORAN & SAGE LLP
                              315 Post Road West
                              Westport, CT  06880
                              (T)     (203) 227-2855
                              (F)     (203) 227-6992
                              Counsel for Defendant Argonaut
                                  Insurance Company

*Of counsel:*
Theresa W. Hajost
Daniel A. Blumenthal

HALLORAN & SAGE LLP
1730 Pennsylvania Avenue, NW
Suite 800
Washington, DC  20006
(T)     (202) 496-9270
(F)     (202) 496-9279

## CERTIFICATION OF SERVICE

This is to certify that the foregoing Memorandum of Law was sent via FedEx on this 7th day of August, 2007, to the following counsel of record:

Joseph J. Schiavone, Esq.
Jeffrey S. Leonard, Esq.
Budd Larner, P.C.
150 John F. Kennedy Parkway
Short Hills, New Jersey  07078

Dan E. LaBelle